## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 25 2019, 6:13 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kimberly A. Jackson
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Caroline G. Templeton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Tywon D. Alexander, *Appellant-Defendant,* | April 25, 2019 |
| v. | Court of Appeals Case No. 18A-CR-1638 |
| | Appeal from the Vigo Superior Court |
| State of Indiana, *Appellee-Plaintiff.* | The Honorable Michael R. Rader, judge |
| | Trial Court Cause No. 84D05-1612-F5-3310 |

**Altice, Judge.**

## Case Summary

Finding that Tywon D. Alexander violated the rules of his work release program, the trial court revoked Alexander's direct placement and ordered him to serve the balance of his five-year sentence in the Indiana Department of Correction (the DOC). Alexander appeals, asserting that his due process rights were violated because he did not have notice of the rules that governed his direct placement and because the trial court admitted hearsay testimony that was not sufficiently reliable. He also claims that the evidence was insufficient to support the revocation of his direct placement.

We affirm.

## Facts & Procedural History

For his involvement in robbing pizza delivery people, the State charged Alexander on December 8, 2016, as later amended in January 2017, under 84D05-1612-F5-3310 (Cause 3310) with fifteen felonies: four counts of Level 5 felony robbery, six counts of Level 5 felony conspiracy to commit robbery, three counts of Level 5 felony attempted robbery, one count of Level 6 felony fraud, and one count of Level 6 felony attempted automobile theft. Pending trial, the trial court placed Alexander in home detention under the supervision of Vigo County Community Corrections.

On March 23, 2017, Alexander pled guilty under Cause 3310 to one count of robbery, one count of attempted robbery, and one count of conspiracy to commit robbery, all Level 5 felonies, and the State dismissed the remaining

charges. On April 27, 2017, the trial court sentenced Alexander to an aggregate five-year term: two years for the robbery conviction, with all but 691 days suspended, to be served on home detention as a direct commitment; a consecutive two years for the attempted robbery conviction, fully suspended, to be served in work release as a direct commitment; and one year of probation for the conspiracy to commit robbery conviction. The home detention and work release sentences were to be served under the supervision of Vigo County Community Corrections. The sentencing order incorporated by reference "all rules and regulations of the Community Corrections Program." *Appellant's Appendix Vol. II* at 64.

[5] That same date, the State filed an amended petition to revoke Alexander's pre-trial placement in home detention, alleging that Alexander failed to report on April 20 and 22 to Vigo County Community Corrections for drug screens, tested positive for THC in an April 24 drug screen, failed to call Community Corrections as required on five occasions, and was in arrears with his home detention fees. On July 24, 2017, the State filed an amended petition, alleging that in June and July 2017, Alexander failed to do each of the following on multiple occasions: failed to call the drug screen hotline, failed to report for work as scheduled, and failed to report for testing. The petition advised that because Alexander was $1395 in arrears in home detention fees, he had been moved in July 2017 to the work release facility.

[6] On August 10, 2017, Alexander appeared for a hearing and admitted that he had violated the terms of placement by failing to appear for drug screens, failing

to call in as ordered, and failing to report to work. The trial court found that Alexander violated the terms of his placement on work release and revoked the remainder of his suspended sentence to the DOC.[1] On November 16, 2017, the trial court modified Alexander's placement and returned Alexander to his original sentence, ordering him "to serve the balance of the 2 years of the previously ordered sentence on Work Release followed by 2 years on Home Detention[,]" and "[u]pon release of those programs the Defendant will be on formal probation for 1 year." *Appellant's Appendix Vol. II* at 100.

[7]     On April 5, 2018, the State filed a Petition to Revoke Direct Placement in the Work Release Program and/or to Revoke Probation (the Petition). The Petition alleged six violations: (1) possession or use of tobacco on February 19, 2018; (2) interfering with attendance count at the facility on February 19; (3) failure to obtain required number of signatures on job search and whereabouts unknown for 2 hours on February 26; (4) a positive drug test for benzodiazepines consistent with Xanax on March 1; (5) out of location/being unaccounted for on March 6 for 1.5 hours; and (6) violation of conditions of temporary leave and unaccounted for on March 28 for a period of 2.5 hours.

[8]     At the May 24, 2018 hearing, the State presented the testimony of Vigo County Community Corrections Case Manager Bradley Burton, who began supervising

---

[1] On August 22 and 30, 2017, the trial court entered nunc pro tunc orders clarifying the two-year sentence for attempted robbery would continue to be served on work release and adjusting the credit time Alexander received.

Alexander's work release in December 2017. Burton did not witness the alleged violations, but was informed of them by other community corrections personnel at the work release facility. As Burton began to testify about Alexander's conduct violations, Alexander objected to Burton's testimony on the basis of hearsay "as this is not from his testimony from direct knowledge" and because "he is testifying from some other officer telling him[.]" *Transcript Vol. 2* at 26. The court overruled the objection noting that Indiana's Rules of Evidence do not apply in probation violation hearings and "the real issue is whether or not it's a reliable report so you get a chance on cross-examination to investigate that." *Id*.

[9]     With regard to the allegation that on February 19 Alexander received a conduct report for violating the rule prohibiting "Possession or Use of Tobacco," Burton testified that an officer found a lighter in Alexander's jacket, which Alexander was not wearing at the time. *Appellant's Appendix Vol. II* at 112. Burton testified that possession of a lighter was a violation of the rules of the work release program and that, when Alexander entered the work release program, he signed a document acknowledging the rules.[2] In his later testimony, Alexander denied that the lighter belonged to him and said that he was not aware that it was in his jacket.

---

[2] The work release rules were not admitted into evidence.

[10]  With regard to the allegation that Alexander interfered with the population count at the work release facility on February 19, Burton testified that when an officer entered Alexander's dorm room at 11:00 p.m. to conduct a population count, Alexander was playing cards, rather than sitting on his bunk. Burton said that, at some prior time, an announcement over the facility's speaker system had been made to tell offenders "to return to your bunk for count" and advising that anyone who was not on his bunk for count at 11:00 p.m. would receive a write-up for interfering with count. *Id*. at 34. Burton testified that interfering with count is a violation of the work release rules that Alexander signed when he entered the facility. Alexander testified that he did not hear any announcement and denied that such announcements are routinely made.

[11]  Concerning the February 26 allegation that Alexander's whereabouts were unknown for two hours, Burton testified that Alexander was authorized to be out of the work release facility on a job search from noon until 4:00 p.m. Burton stated that the work release rules required Alexander to obtain a minimum of three signatures from prospective employers and that, on February 26, Alexander provided two. He did not obtain any signature between approximately 1:30 p.m. and 3:30 p.m., and his whereabouts were unknown. Burton testified that this was a violation of the work release rules that Alexander had signed off on. Alexander maintained that he "had no idea" that he needed three signatures and that if anyone had asked him where else he had gone, he would have obtained the additional signature. *Id*. at 44.

[12] As to the allegation of the March 1 failed drug test, Burton testified that Alexander tested positive for benzodiazepines and that the test was sent to Norchem Solutions lab for verification. Burton confirmed that the positive screen was a violation of the work release program's rules. Alexander acknowledged at the hearing that he had consumed a pill that day that his "line leader" had given him to calm his stomach because he was vomiting due to what he believed was food poisoning. Alexander claimed, however, that he did not know that the pill was Xanax and if he had, he would not have taken it. *Id.* at 45.

[13] Regarding the allegation that, for a one and one-half hour period on March 6, Alexander was unaccounted for, Burton testified that Alexander was authorized to be away from the work release facility for four hours to search for a job. Alexander conducted his job search at a mall and returned with the required three signatures, but Burton testified that persons in work release are "not permitted to be at the mall" and therefore the mall was not an appropriate place to look for work. *Id.* at 30. Burton was uncertain whether that rule about the mall appears in the program's written rules, stating "I guess you could just consider it an unwritten rule." *Id.* at 29-30. Burton explained that it is "[j]ust like you're not allowed to go to a restaurant[,]" and "[y]ou're not allowed to go to somebody's house." *Id.* at 39-40. Alexander testified that he did not know that he was not allowed to enter the mall to seek a job there.

[14] As to the allegation that Alexander violated conditions of temporary leave on March 28, with his whereabouts not known for a period of 2.5 hours, Burton

testified that Alexander had been granted permission to be out of the facility and at the Hamilton Center from 2:30 to 5:30 p.m. and that Alexander returned to the work release facility fifteen to twenty minutes late. Burton testified that, upon Alexander's late return, a work release officer contacted Hamilton Center and was advised by the personnel in "Scheduling" and "Reception," that Alexander "showed up and cancelled stating that he was going to the hospital." *Id*. at 31. Work release personnel contacted two local hospitals and were informed that no one with Alexander's name had been at either place that day. Burton stated that he asked Alexander about it and that Alexander told him he went to Hamilton Center but was sick. Burton testified that because Alexander provided no proof either that he stayed at Hamilton Center or that he went to a hospital, his whereabouts were considered "unknown" during that time frame. *Id*. at 32.

[15] Alexander testified that he was ill that day, "still sick from the nausea that I had from the food poisoning," and was vomiting and had diarrhea. *Id*. at 47. He said that, after walking an hour to Hamilton Center for his appointment, he went directly to the bathroom and stayed for an hour. He testified that when he exited the bathroom he saw the woman at Scheduling and told her that he was going back to work release because he was sick. He denied that he told anyone at Hamilton Center that he was going directly from there to a hospital.

[16] The trial court found that Alexander's testimony was "not credible," that Alexander had received a lenient sentence, that he already had his direct placement revoked once before, and that "we are back with a number of

violations that indicate either an unwillingness or an inability to comply with []

the rules of your placement." *Id*. at 54, 58. The court revoked Alexander's

direct placement and ordered him to serve the balance of his five-year sentence

in the DOC in the Purposeful Incarceration program. Alexander requested and

received permission to file this belated appeal.

## Discussion & Decision

[17] A defendant is not entitled to serve a sentence in either probation or a

community corrections program. *Monroe v. State*, 899 N.E.2d 688, 691 (Ind. Ct.

App. 2009). Such placement is a matter of grace and a conditional liberty that

is a favor, not a right. *Id*. For purposes of appellate review, a petition to revoke

placement in a community corrections program such as work release or home

detention is treated the same on appeal as a petition to revoke probation. *Bass v.

State*, 974 N.E.2d 482, 488 (Ind. Ct. App. 2012) (citing *Cox v. State*, 706 N.E.2d

547, 549 (Ind. 1999)). The appellate court considers the evidence most

favorable to the judgment without reweighing that evidence or judging the

credibility of the witnesses. *Monroe*, 899 N.E.2d at 691. If there is substantial

evidence of probative value to support the trial court's conclusion that a

defendant has violated any terms of probation, we will affirm its decision to

revoke probation. *Holmes v. State*, 923 N.E.2d 479, 483 (Ind. Ct. App. 2010)

(citing *Monroe*, 899 N.E.2d at 691).

[18] In challenging the revocation of his direct placement, Alexander asserts that he

was denied due process in two ways: (1) he received inadequate notice of the

rules governing his direct placement, and (2) the trial court admitted "inadmissible, often multi-level hearsay" through Burton, which did not meet the requirements of the substantial trustworthiness test and thereby denied Alexander's right to confront witnesses against him. *Appellant's Brief* at 12. Alexander argues that, even if he was not denied due process, the evidence was insufficient to revoke his direct placement. We address his arguments in turn.

## I. Due Process

[19]  While an individual at a probation revocation hearing does not possess the same rights with which he was endowed prior to a conviction, the due process clause of the Fourteenth Amendment does provide certain protections to probationers at revocation hearings. *J.H. v. State*, 857 N.E.2d 429, 432 (Ind. Ct. App. 2006), *trans. denied*. A defendant facing revocation of either a community corrections placement or probation "is entitled to representation by counsel, written notice of the claimed violations, disclosure of the opposing evidence, an opportunity to be heard and present evidence, and the right to confront and cross-examine witnesses in a neutral hearing before the trial court." *Cox*, 706 N.E.2d at 550.

### 1. Notice

[20]  Alexander challenges the determinations that he interfered with count and failed to get required job signatures, claiming that he had no notice of those work release rules. We find, however, that the trial court was presented with sufficient evidence from which it could have found that Alexander had notice of

the rules. First, the trial court's April 2017 sentencing order on Alexander's guilty plea, which sentenced Alexander to home detention and then work release, expressly "incorporate[d] by reference all rules and regulations of the Community Corrections Program." *Appellant's Appendix Vol. II* at 64. Second, Burton testified at the revocation hearing that interfering with count and obtaining three signatures in a job search were rules of the facility that Alexander signed and acknowledged upon intake. Burton also testified that the work release facility made an announcement over the speaker system advising offenders to be in their bunks at 11:00 p.m. or they would be written up for interfering with count. The trial court found Alexander's testimony, claiming that he was not aware that he had to be in his bunk at the designated time or "had no idea" that he needed three signatures, was not credible. *Transcript Vol. 2* at 44. We do not reweigh the evidence or judge the credibility of witnesses on appeal. *Monroe*, 899 N.E.2d at 691.

[21] Alexander suggests that because the work release rules were not admitted at the revocation hearing, "the trial court could not, and [the appellate] Court cannot, determine whether Alexander received appropriate notice through the written rules of what conduct would constitute a violation of his placement." *Appellant's Brief* at 15. We disagree. Alexander provides no authority for the assertion that the State was required to introduce the rules into evidence. Moreover, as stated, Burton testified that interfering with count, as well as obtaining three signatures in a job search, were written rules of the work release facility and that Alexander signed and acknowledged his understanding of

them. Accordingly, the trial court was presented with evidence from which it could determine whether Alexander's conduct violated the rules of his placement.

[22] Alexander also challenges the notice, or lack thereof, as to the mall violation, asserting that he had no notice of any rule that precluded him from seeking employment at the mall. Burton's testimony indicated that the prohibition regarding visiting and being employed at the mall may not have been written, and instead, was more of an "unwritten" rule known and understood by offenders. *Transcript Vol. 2* at 29-30. Burton was not sure whether Alexander had ever been expressly told that he was not permitted to be at the mall. Based on the evidence before it, the trial court found Alexander's testimony that he was not aware of any such limitation was not credible. Again, we cannot reweigh the credibility of witnesses on appeal. *Monroe*, 899 N.E.2d at 691. That said, even if we were to find that Alexander did not have notice of this particular rule, any error in basing revocation of direct placement on this was harmless given that, as we discuss later in this decision, multiple other violations supported the revocation. *See Figures v. State*, 920 N.E.2d 267, 272-73 (Ind. Ct. App. 2010) (revocation court's finding that probationer had committed new crime was not supported by evidence but error was harmless where sufficient evidence supported two other probation violations found by court).

[23] In a related but different notice argument, Alexander asserts that the Petition provided "[d]eficient notice . . . relating to Alexander's alleged violation of a

rule governing tobacco use." *Appellant's Brief* at 16. Alexander is referring to the following allegation of the Petition:

> a. That on February 19th, 2018 Tywon Alexander received a report of conduct for violation of rule 305C Possession or Use of Tobacco. Mr. [Alexander] received a sanction verbal warning.

*Appellant's Appendix Vol. II* at 112. Alexander's argument is that because "[t]he petition did not mention a lighter, much less allege Alexander's possession of a lighter violated the work release rules[,]" the Petition to revoke "did not notify Alexander that the State was alleging Alexander's possession of a lighter violated Rule 305C or any other alleged work release rule." *Appellant's Brief* at 16. Alexander correctly observes that due process requires that the petition for revocation disclose the grounds upon which revocation is being sought. *Washington v. State*, 758 N.E.2d 1014, 1017 (Ind. Ct. App. 2001). However, we reject Alexander's argument for a couple of reasons.

[24] First, when Burton was being questioned at the hearing about that "Possession or use of tobacco" violation, and Burton testified that Officer Freeman "wrote [] up" Alexander for having the "small yellow lighter," Alexander never objected or asserted, as he does now, that he did not receive notice that he was facing revocation for possession of a lighter. *Transcript Vol. 2* at 27-28. Rather, his position at the revocation hearing was that the lighter was not his and he did not know it was in his jacket. Based on this record, Alexander has waived any argument that he did not know, i.e. lacked notice, that the State was seeking revocation of his placement for his possession of the lighter. *See Cox*, 706

N.E.2d at 552 n.12 (noting that defendant waived claim that he was not provided with written notice of the work release violation where he did not object to lack of written notice at revocation hearing).

Waiver notwithstanding, we find that Alexander received adequate written notice in the Petition of the alleged violation. The Petition plainly charged that Alexander had violated his direct placement because, on February 19, he received a conduct violation "for violation of rule 305C Possession or Use of Tobacco" and that he received a verbal warning. Alexander acknowledged at the hearing that on that date Officer Freeman found a lighter in his jacket pocket and asked him about it, to which he responded that it did not belong to him and did not know it was in his jacket. The Petition adequately apprised Alexander that the State was seeking revocation based on his conduct on February 19. *See Braxton v. State*, 651 N.E.2d 268, 270 (Ind. 1995) (rejecting defendant's claim that petition did not provide notice upon which revocation was being sought where the notice of violation alleged that defendant violated condition of suspended sentence because on a certain date defendant had committed disorderly conduct and possession of marijuana). Alexander has failed to show that his due process rights were violated due to lack of notice.

## 2. *Confrontation of Witnesses*

Alexander next argues that his right to due process was violated through the admission of Burton's testimony because his testimony "as to all of the alleged violations" consisted of "extensive, unreliable, and often multi-level hearsay," and, consequently, Alexander was denied his right "to confront the sources of

most of the evidence against him." *Appellant's Brief* at 17, 22. As Alexander acknowledges, Indiana's Rules of Evidence do not apply in probation and community corrections proceedings. *See Holmes*, 923 N.E.2d at 482 ("[T]he Indiana Rules of Evidence in general and the rules against hearsay in particular do not apply in community corrections placement revocation hearings."). In probation and community corrections placement revocation hearings, judges may consider any relevant evidence bearing some substantial indicia of reliability, and this includes reliable hearsay. *Id*. "The absence of strict evidentiary rules places particular importance on the fact-finding role of judges in assessing the weight, sufficiency and reliability of proffered evidence." *Id*. at 482-83.

[27] In determining the admissibility of hearsay evidence in revocation proceedings and whether such admission violates an accused's right to due process, Indiana has adopted a substantial trustworthiness test. *Reyes v. State*, 868 N.E.2d 438, 441 (Ind. 2007). "The substantial trustworthiness test requires that the trial court evaluate the reliability of the hearsay evidence." *Id*. at 442. Alexander claims on appeal that "[t]he hearsay admitted or considered by the trial court in this case does not pass [the substantial trustworthiness] test." *Appellant's Brief* at 18. We disagree.

[28] We have previously upheld a trial court's decision to admit a law enforcement officer's testimony concerning notifications from fellow law enforcement personnel. *See, e.g., Monroe*, 899 N.E.2d at 691 (holding that community corrections officer's testimony regarding fellow officers' report of discovering

firearm at probationer's residence did not lack indicia of reliability where officers knew each other and had history of working together). We acknowledge that, in this case, the evidence presented concerning the officers who reported the violations to case manager Burton did not include how long each community corrections officer had been working as such or whether Burton had a history of working with the officer. Nevertheless, we are satisfied that the trial court was presented with sufficient evidence from which it could have determined that the hearsay was reliable.

[29] Burton testified with some specificity as to each separate violation, including identification on several occasions of the officer that saw the conduct and reported it. For instance, "Officer Freeman" found the lighter, and he was also the officer who saw Alexander return late to the facility on March 28, when he was to have had an appointment at Hamilton Center. *Transcript Vol. 2* at 27. Officer Freeman also was the person who called "Tammy" in "Scheduling" and "Melissa" in "Reception" at Hamilton Center. *Id*. at 30. "Officer Ruddock" was the officer who observed Alexander playing cards rather than being in his bunk at 11:00 p.m. *Id*. at 33. Burton identified the name of the lab where the March 1 drug screen was sent for testing, namely Norchem Solutions. Burton identified the written rules that had been violated, and he also frankly acknowledged that the mall rule was "unwritten" and he was unsure if it was ever directly told to Alexander. *Id*. at 30. The trial court ultimately determined that Alexander had committed the violations as alleged in the Petition, and implicit in that decision is the trial court's determination that it had evaluated

Burton's testimony and found the hearsay evidence to be credible and reliable.[3] We conclude that, under the facts of this case, the trial court had sufficient information to determine that the hearsay was substantially trustworthy.

[30] Furthermore, the State argues, and we agree, any error was harmless and reversal is not warranted. Here, even excluding Burton's testimony regarding the lighter, interference with count, lack of required job search signatures, and unknown whereabouts on March 6 when he was at the mall, Alexander admitted other matters upon which the trial court could have based revocation. For instance, Alexander testified that he took a pill on March 1 and thereafter tested positive in a screen for Xanax. As to the allegation that on March 28 he violated the conditions of temporary leave by not attending a scheduled appointment at Hamilton Center, Alexander testified that he walked to Hamilton Center, but did not attend his appointment, cancelled and rescheduled it, and walked back, returning late to the work release facility. Burton testified that he spoke to Alexander about it, and Alexander did not provide any verification of being there or of a rescheduled appointment. The trial court expressly found that Alexander's testimony, with excuses for the violations, was not credible. Thus, the trial court could have revoked direct placement on the basis of the failed drug test or violation of temporary leave,

---

[3] Our Supreme Court in *Reyes v. State* stated, "[I]deally [the trial court should explain] on the record why the hearsay [is] reliable and why that reliability [is] substantial enough to supply good cause for not producing ... live witnesses.'" 868 N.E.2d 438, 442 (Ind. 2007) (quoting *United States v. Kelley*, 446 F.3d 688, 693 (8th Cir. 2004)). However, "[i]f the test of substantial trustworthiness of hearsay evidence is met, a finding of good cause has also implicitly been made." *Id*.

and any error in the admission of Burton's testimony on the other violations was harmless. *See Grubb v. State*, 734 N.E.2d 589, 593 (Ind. Ct. App. 2000) (applying harmless error analysis to find that even assuming it was error to admit videotaped statements of children in support of revocation based on allegations of child molestation, defendant's probation could have been revoked because he consumed alcohol), *trans. denied*. Alexander's due process rights were not violated by Burton's testimony at the revocation hearing.

## II. Sufficiency of the Evidence

[31]   Alexander argues that, even if no violation of due process occurred, the evidence was insufficient to support the trial court's finding that Alexander violated the terms of his direct placement. The State must prove the alleged violations by a preponderance of the evidence. *Holmes*, 923 N.E.2d at 483 (quoting *Monroe*, 899 N.E.2d at 691). When reviewing the sufficiency of the evidence to support revocation of a community corrections placement or probation, we consider only the evidence most favorable to the trial court's decision without reweighing evidence or judging witness credibility. *Id.* We will affirm if there is substantial evidence of probative value to support the conclusion that a defendant has violated any terms of community corrections placement or probation. *Id.* Even if a trial court has made erroneous findings with respect to some alleged violations, proof of any one violation of community corrections rules or probation is sufficient on appeal to affirm revocation. *See id*.

[32] While Alexander argues that the State failed to present sufficient evidence to revoke his probation, more precisely, his argument is that the State failed to offer sufficient *admissible* evidence to support the revocation. We have already determined that the record supported the trial court's determination that the hearsay testimony met the substantial trustworthiness test. The State's evidence showed that Alexander possessed a lighter, was not in his bunk at 11:00 p.m. for count, failed to obtain required job signatures, and failed to comply with conditions of temporary release when he did not attend the scheduled appointment at Hamilton Center. By his own admission, Alexander tested positive on March 1 to a Xanax product.

[33] We conclude that the State presented sufficient evidence from which the court could find by a preponderance of the evidence that Alexander violated one or more terms of the work release program. The trial court properly revoked Alexander's direct placement.

[34] Judgment affirmed.

Najam, J. and Pyle, J., concur.